(No. 70501.—)

NANCY CURRAN, Appellee, v. TAMAS BOSZE, Appellant.

*Announced September 28, 1990.—Opinion filed December 20, 1990.*

Robert H. Riley, Catherine Masters Epstein, Aphrodite Kokolis and Thomas P. Heneghan, of Schiff, Hardin & Waite, of Chicago, and Edward R. Jordan, of Wheeling, for appellant.

Beverly A. Pekala and Carol M. Douglas, of Grotefeld, Johnson, Pekala & Durkin, Chtrd., of Chicago, for appellee.

Charles J. Fleck, of Chicago (Sarane C. Siewerth, of counsel), guardian *ad litem* for Allison and Jimmy Curran.

Sheldon Engel, of Chicago, guardian *ad litem* for Jean Pierre Bosze.

JUSTICE CALVO delivered the opinion of the court:

Allison and James Curran are 3½-year-old twins. Their mother is Nancy Curran. The twins have lived with Ms. Curran and their maternal grandmother since their birth on January 27, 1987.

The twins' father is Tamas Bosze. Ms. Curran and Mr. Bosze have never been married. As a result of an action brought by Ms. Curran against Mr. Bosze concerning the paternity of the twins, both Mr. Bosze and the twins underwent a blood test in November of 1987. The blood test confirmed that Mr. Bosze is the father of the twins. On February 16, 1989, Mr. Bosze and Ms. Curran entered into an agreed order (parentage order) establishing a parent-child relationship. The parentage order states that Ms. Curran "shall have the sole care, custody, control and educational responsibility of the minor children." Section B, paragraph 4, of the order provides:

> "In all matters of importance relating to the health, welfare and education of the children, Mother shall consult and confer with Father, with a view toward adopting and following a harmonious policy. Mother shall advise Father of which school the children will attend and both parents shall be given full access to the school records of the children."

Section M of the parentage order provides that the court retain jurisdiction over the parties and subject matter for the purposes of enforcing the agreed order.

Mr. Bosze is the father of three other children: a son, age 23; Jean Pierre Bosze, age 12; and a one-year-old daughter. Ms. Curran is not the mother of any of these children. Each of these children has a different mother. Jean Pierre and the twins are half-siblings. The twins have met Jean Pierre on two occasions. Each meeting lasted approximately two hours.

Jean Pierre is suffering from acute undifferentiated leukemia (AUL), also known as mixed lineage leukemia. Mixed lineage leukemia is a rare form of leukemia which is difficult to treat. Jean Pierre was initially misdiagnosed as having acute lymphocytic leukemia (ALL) in June 1988, in Colombia, South America. Jean Pierre was brought to America in August 1988, and has been treated by Dr. Jong Kwon since that time. Jean Pierre was treated with chemotherapy and went into remission. Jean Pierre experienced a testicular relapse in January 1990, and a bone marrow relapse in mid-June 1990. Dr. Kwon has recommended a bone marrow transplant for Jean Pierre.

Mr. Bosze asked Ms. Curran to consent to a blood test for the twins in order to determine whether the twins were compatible to serve as bone marrow donors for a transplant to Jean Pierre. Mr. Bosze asked Ms. Curran to consent to the twins' undergoing a bone marrow harvesting procedure if the twins were found to be compatible. After consulting with the twins' pediatrician, family members, parents of bone marrow donors and bone marrow donors, Ms. Curran refused to give consent to the twins' undergoing either the blood test or the bone marrow harvesting procedure.

On June 28, 1990, Mr. Bosze filed an emergency petition in the circuit court of Cook County. The petition informed the court that Jean Pierre "suffers from leukemia and urgently requires a [bone] marrow transplant from a compatible donor. Without the transplant he will

die in a short period of time, thereby creating an emergency involving life and death." The petition stated that persons usually compatible for serving as donors are parents or siblings of the recipient, and Jean Pierre's father, mother, and older brother had been tested and rejected as compatible donors.

According to the petition, "[t]he only siblings who have potential to be donors and who have not been tested are the children, James and Allison." The petition stated Ms. Curran refused to discuss with Mr. Bosze the matter of submitting the twins to a blood test to determine their compatibility as potential bone marrow donors for Jean Pierre. The petition stated the blood test "is minimally invasive and harmless, and no more difficult than the paternity blood testing which the children have already undergone." According to the petition, there would be no expense involved to Ms. Curran.

In the petition, Mr. Bosze requested the court find a medical emergency to exist and order and direct Ms. Curran to "forthwith produce the parties' minor children *** at Lutheran General Hospital *** for the purpose of compatibility blood testing." Further, Mr. Bosze requested in the petition that "if the children, or either of them, are compatible as donors, that the Court order and direct that [Ms. Curran] produce the children, or whichever one may be compatible, for the purpose of donating bone marrow to their sibling."

The court ordered Mr. Bosze and Ms. Curran to prepare briefs on the court's authority to grant the relief requested, and the cause was continued for presentation of medical testimony until July 2, 1990. Both Ms. Curran and Mr. Bosze testified at the hearing. Mr. Bosze called Dr. Jong Kwon, Jean Pierre's treating physician, and Mr. Steven Epstein, a 48-year-old man who had received a bone marrow transplant from his brother. Ms. Curran called Dr. Frank L. Johnson, a physician who has per-

formed bone marrow transplants for 19 years. After hearing the testimony of the witnesses, and the arguments of counsel for both Ms. Curran and Mr. Bosze, the court ruled on July 18, 1990, that it did not have authority to grant Mr. Bosze's petition.

On July 19, 1990, Mr. Bosze filed a notice of appeal and an emergency motion for direct appeal to this court pursuant to Supreme Court Rule 302(b) (107 Ill. 2d R. 302(b)). This court granted Mr. Bosze's motion on July 20, 1990.

On August 9, 1990, counsel for Mr. Bosze and Ms. Curran appeared before this court for oral argument. On August 10, 1990, this court remanded the cause to the circuit court for further proceedings. This court directed Mr. Bosze to make the twins parties-defendants to the cause, and ordered that a guardian *ad litem* be appointed to represent the twins. Mr. Bosze was further directed to make Jean Pierre a party-plaintiff to the cause, and a guardian *ad litem* was ordered to be appointed to represent Jean Pierre. Upon remand, counsel for Mr. Bosze and Ms. Curran, as well as the guardian *ad litem* for Jean Pierre and the guardian *ad litem* for the twins, were to be permitted to present further evidence.

After the cause was remanded, the circuit court heard the extensive testimony of several witnesses. Ms. Curran called Dr. Bennett L. Leventhal, a physician and professor of psychiatry and pediatrics; Dr. Jay Lance Lechtor, an anesthesiologist in charge of pediatric anesthesia; and Dr. Arthur F. Kohrman, a physician and professor of pediatrics. Ms. Curran also testified. Mr. Bosze called Dr. Bruce Camitta, a physician who has been performing bone marrow transplants for 18 years. Mr. Bosze called Ms. Janet Heumann, Ms. Maureen Watowicz, and Ms. Judy Swanson, all of whom are parents who have had one of their children donate bone marrow to a sibling. Mr. Bosze also called Mr. Steve Swanson,

who had donated bone marrow to his sister. The guardian *ad litem* for the twins called Mr. Bosze as an adverse witness, and Dr. Kwon.

After hearing the testimony of the witnesses, the arguments of counsel, and the arguments of the guardians *ad litem*, the circuit court denied Mr. Bosze's petition for emergency relief. All parties have filed briefs before this court. Motions by the Roger Baldwin Foundation of the American Civil Liberties Union, Inc., and the Illinois Trial Lawyers Association to file *amicus curiae* briefs were denied.

## I

Mr. Bosze and the guardian *ad litem* for Jean Pierre strenuously argue that the doctrine of substituted judgment, recognized by this court in *In re Estate of Longeway* (1989), 133 Ill. 2d 33, and *In re Estate of Greenspan* (1990), 137 Ill. 2d 1, should be applied in this case to determine whether or not the twins would consent, if they were competent to do so, to the bone marrow donation if they, or either of them, were compatible with Jean Pierre. The doctrine of substituted judgment requires a surrogate decisionmaker to "attempt[ ] to establish, with as much accuracy as possible, what decision the patient would make if [the patient] were competent to do so." (*Longeway*, 133 Ill. 2d at 49.) Mr. Bosze and the guardian *ad litem* for Jean Pierre contend the evidence clearly and convincingly establishes that the twins, if competent, would consent to the bone marrow harvesting procedure.

Ms. Curran and the guardian *ad litem* for the twins vigorously object to the application of the doctrine of substituted judgment in this case. It is the position of Ms. Curran and the guardian *ad litem* for the twins that it is not possible to establish by clear and convincing evidence whether the 3½-year-old twins, if they were competent—that is, if they were not minors but were adults

with the legal capacity to consent—would consent or refuse to consent to the proposed bone marrow harvesting procedure. According to Ms. Curran and the guardian *ad litem* for the twins, the decision whether or not to give or withhold consent to the procedure must be determined by the best-interests-of-the-child standard. Ms. Curran and the guardian *ad litem* for the twins argue that the evidence reveals it is not in the best interests of the children to require them to submit to the bone marrow harvesting procedure.

This court recognized the doctrine of substituted judgment in *Longeway*. The issue addressed by this court in *Longeway* was whether the guardian of a formerly competent, now incompetent, seriously ill adult patient may exercise a right to refuse artificial nutrition and hydration on behalf of his or her ward and, if so, how this right may be exercised. This court determined that a right to refuse life-sustaining medical treatment exists in our State's common law and in provisions of the Illinois Probate Act. This court held that the common law right to refuse medical treatment includes, under the appropriate circumstances, artificial nutrition and hydration.

Under common law, "a patient normally must consent to medical treatment of any kind. Consent is required to maintain the right of personal inviolability." (*Longeway*, 133 Ill. 2d at 44.) Further, "because a physician must obtain consent from a patient prior to initiating medical treatment, it is logical that the patient has a common law right to withhold consent and thus refuse treatment." (*Longeway*, 133 Ill. 2d at 45.) "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of [the individual's] own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union*

*Pacific Ry. Co. v. Botsford* (1891), 141 U.S. 250, 251, 35 L. Ed. 734, 737, 11 S. Ct. 1000, 1001.

At issue in *Longeway* was not the personal exercise by the patient of the right to refuse medical treatment, "but rather *** the exercise of this common law right through a surrogate." (*Longeway*, 133 Ill. 2d at 45.) This court determined that section 11a—17 of the Probate Act of 1975 (Ill. Rev. Stat. 1987, ch. 110½, par. 11a—17), which permits a guardian to make provisions for the ward's "support, care, comfort, health, education and maintenance," impliedly authorizes a guardian to exercise the right to refuse sustenance on the ward's behalf. *Longeway*, 133 Ill. 2d at 45.

In *Longeway*, this court held that a guardian may exercise the right to refuse artificial sustenance on behalf of a ward in accordance with certain guidelines. This court determined that the doctrine of substituted judgment had been implicitly adopted by the General Assembly in the Powers of Attorney for Health Care Law, which states: "[Y]our agent will have authority *** to obtain or terminate any type of health care, including withdrawal of food and water *** if your agent believes such action would be consistent with your intent and desires." Ill. Rev. Stat. 1987, ch. 110½, par. 804—10.

This court recognized two sources of appropriate evidence by which a guardian may be guided in determining whether a formerly competent, now incompetent, patient would choose to refuse artificial nutrition and hydration. The first source requires the surrogate to "determine if the patient had expressed explicit intent regarding this type of medical treatment prior to becoming incompetent." (*Longeway*, 133 Ill. 2d at 49.) If there is no clear evidence of such intent, then the patient's personal value system must guide the surrogate:

" ' "[E]ven if no prior specific statements were made, in the context of the individual's entire prior mental life,

including his or her philosophical, religious and moral views, life goals, values about the purpose of life and the way it should be lived, and attitudes toward sickness, medical procedures, suffering and death, that individual's likely treatment/nontreatment preferences can be discovered. Family members are most familiar with this entire life context. Articulating such knowledge is a formidable task, requiring a literary skill beyond the capacity of many, perhaps most, families. But the family's knowledge exists nevertheless, intuitively felt by them and available as an important decisionmaking tool." ' *Jobes*, 108 N.J. at 415, 529 A.2d at 445, quoting Newman, *Treatment Refusals for the Critically Ill: Proposed Rules for the Family, the Physician and the State*, 3 N.Y.L. Sch. Hum. Rts. Ann. 45-46 (1985)." (*Longeway*, 133 Ill. 2d at 49-50.)

The guardian is required to prove by clear and convincing evidence whether the incompetent patient, if competent, would choose to terminate artificial nutrition and hydration if the guardian is to be allowed to substitute his or her judgment for the incompetent's judgment. *Longeway*, 133 Ill. 2d at 50-51.

The best-interests standard, by which a guardian, in the exercise of his or her judgment, determines what is best for the ward, was rejected by this court in *Longeway* as an inappropriate vehicle by which a guardian may be guided in determining whether an incompetent patient, in either an irreversible coma or a persistent vegetative state, should have artificial nutrition and hydration withdrawn. This court rejected the best-interests standard because "it lets another make a determination of a patient's quality of life, thereby undermining the foundation of self-determination and inviolability of the person upon which the right to refuse medical treatment stands." (*Longeway*, 133 Ill. 2d at 49.) By requiring a guardian to proceed under the doctrine of substituted judgment instead of the best-interests standard, the inquiry is necessarily focused on whether the formerly

competent, now incompetent, patient had ever manifested an intent as to whether he or she would consent or refuse to consent to artificial nutrition and hydration.

In *Greenspan*, this court addressed the issue of the use of the doctrine of substituted judgment by a guardian of an incompetent person in a chronic vegetative state. The guardian of Mr. Greenspan requested leave of court to order the withdrawal of artificial nutrition and hydration as "Mr. Greenspan's surrogate and in order to give effect to what are represented as Mr. Greenspan's own wishes." (*Greenspan*, 137 Ill. 2d at 15.) It was argued by court-appointed *amicus curiae*, Americans United for Life (AUL), that the discontinuance of Mr. Greenspan's artificial nutrition and hydration would result in his death and would not be in Mr. Greenspan's best interests.

In *Greenspan*, this court stated: "Though a guardian's duty is to act in a ward's best interest, such a standard is necessarily general and must be adapted to particular circumstances. One such circumstance is a ward's wish to exercise common law, statutory, or constitutional rights, which may sometimes influence or even override a guardian's own perception of best interests." *Greenspan*, 137 Ill. 2d at 17.

Further, this court stated:

> "This tension between a ward's legal rights of volition and a guardian's own judgment of the ward's best interests resembles the tension this court discerned in *Longeway* (133 Ill. 2d at 48-49) between the best-interests and substituted-judgment theories for deciding whether to discontinue an incompetent and terminally ill patient's artificial life support.
>
> In *Longeway*, this court approved application of the substituted-judgment theory, which requires a surrogate decisionmaker to establish, as accurately as possible, what the patient would decide if competent. (*Longeway*, 133 Ill. 2d at 49.) Ascertainment of what the patient

would decide must be based on clear and convincing evidence of the patient's intent, derived either from a patient's explicit expressions of intent or from knowledge of the patient's personal value system. *Longeway*, 133 Ill. 2d at 49-51, citing *In re Jobes* (1987), 108 N.J. 394, 415, 529 A.2d 434, 445.

If it is clearly and convincingly shown that Mr. Greenspan's wishes would be to withdraw artificial nutrition and hydration, and if the other established criteria for permitting such withdrawal are met, Mr. Greenspan's imputed choice cannot be governed by a determination of best interests by the public guardian, AUL, or anyone else. Otherwise, the substituted-judgment procedure would be vitiated by a best-interests guardianship standard, elevating other parties' assessments of the meaning and value of life—or, at least, their assessments of what a reasonable individual would choose—over the affected individual's own common law right to refuse medical treatment. Accordingly, the public guardian is not prevented by a best-interests standard from seeking relief in accordance with Mr. Greenspan's wishes as determined by substituted-judgment procedure." *Greenspan*, 137 Ill. 2d at 17-18.

Mr. Bosze argues that the twins, if they had the legal capacity, would have the right to consent or refuse to consent to the proposed bone marrow harvesting procedure. Mr. Bosze argues that if the doctrine of substituted judgment is not applied in this case, the twins' right to consent or refuse to consent to medical treatment, which they would have if they were competent, would be violated. Since the twins are without legal capacity to consent or refuse to consent to the proposed bone marrow harvesting procedure, and since the parents do not agree, Mr. Bosze argues that both his and Ms. Curran's opinions regarding whether the twins should serve as bone marrow donors should be read out of the equation, and the court, applying the doctrine of substituted judgment, should look solely to what the twins would decide

to do if they were competent. Mr. Bosze argues that the standard of the best interests of the child, traditionally the standard in cases involving minors, may not be used because this court rejected the best-interests standard in *Longeway* and *Greenspan*.

In *Longeway*, however, this court did "not pass[ ] on the viability of the best-interests theory in Illinois, [and] we decline[d] to adopt it in [that] case because we believe[d] the record demonstrate[d] the relevancy of the substituted-judgment theory." (*Longeway*, 133 Ill. 2d at 49.) Concerning the use of the doctrine of substituted judgment, this court in *Longeway* recognized that "[a] dilemma [exists] *** when the patient is an infant or life-long incompetent who never could have made a reasoned judgment about his [or her] quality of life." (*Longeway*, 133 Ill. 2d at 49.) Mr. Bosze argues that this dilemma was resolved by this court in *Longeway* when it stated that "although actual, specific express intent would be helpful and compelling, the same is not necessary for the exercise of substituted judgment by a surrogate." *Longeway*, 133 Ill. 2d at 50.

Immediately following this statement in *Longeway*, however, this court stated: "In this case, Mrs. Longeway's guardian must substitute her judgment for that of Longeway's, based upon *other* clear and convincing evidence of Longeway's intent." (Emphasis added.) (*Longeway*, 133 Ill. 2d at 50-51.) This language addressed the instance where a formerly competent, now incompetent, patient had never "expressed explicit intent regarding [the] type of medical treatment prior to becoming incompetent." (*Longeway*, 133 Ill. 2d at 49.) This language did not address the dilemma of a guardian substituting the judgment of one who never has been able to make "a reasoned judgment about his [or her] quality of life." (*Longeway*, 133 Ill. 2d at 49.) In applying the doctrine of substituted judgment, "the key element in deciding to

refuse or withdraw artificial sustenance is determining the patient's intent." *Longeway*, 133 Ill. 2d at 51.

Under the doctrine of substituted judgment, a guardian of a formerly competent, now incompetent, person may look to the person's life history, in all of its diverse complexity, to ascertain the intentions and attitudes which the incompetent person once held. There must be clear and convincing evidence that the formerly competent, now incompetent, person had expressed his or her intentions and attitudes with regard to the termination of artificial nutrition and hydration before a guardian may be authorized to exercise, on behalf of the incompetent person, the right of the incompetent person to terminate artificial sustenance.

If the doctrine of substituted judgment were to be applied in this case, the guardian of the 3½-year-old twins would have to substitute his or her judgment for that of the twins, based upon clear and convincing evidence of the twins' intent. (*Longeway*, 133 Ill. 2d at 50-51.) Because each twin is only 3½ years of age, neither has yet had the opportunity to develop "actual, specific express intent," or any other form of intent, with regard to serving as a bone marrow donor. We agree with Ms. Curran and the guardian *ad litem* for the twins that it is not possible to determine the intent of a 3½-year-old child with regard to consenting to a bone marrow harvesting procedure by examining the child's personal value system. It is not possible to discover the child's " ' "likely treatment/nontreatment preferences" ' " by examining the child's " ' "philosophical, religious and moral views, life goals, values about the purpose of life and the way it should be lived, and attitudes toward sickness, medical procedures, suffering and death." ' " (*Longeway*, 133 Ill. 2d at 50, quoting *In re Jobes* (1987), 108 N.J. 321, 486 A.2d 1209.) The twins have not yet developed the power of self-determination and are not yet capable of making

an informed, rational decision based upon all the available information concerning the risks and benefits associated with serving as bone marrow donors. There is no evidence by which a guardian may be guided in ascertaining whether these 3½-year-old children, if they were adults, would or would not consent to a bone marrow harvesting procedure for another child, their half-brother whom they have met only twice.

The doctrine of substituted judgment requires clear and convincing proof of the incompetent person's intent before a court may authorize a surrogate to substitute his or her judgment for that of the incompetent. Any lesser standard would "undermin[e] the foundation of self-determination and inviolability of the person upon which the right to refuse medical treatment stands." (*Longeway*, 133 Ill. 2d at 49.) A guardian attempting to prove what a 3½-year-old child would or would not do in a given set of circumstances at a given time in the distant future would have to rely on speculation and conjecture.

Neither justice nor reality is served by ordering a 3½-year-old child to submit to a bone marrow harvesting procedure for the benefit of another by a purported application of the doctrine of substituted judgment. Since it is not possible to discover that which does not exist, specifically, whether the 3½-year-old twins would consent or refuse to consent to the proposed bone marrow harvesting procedure if they were competent, the doctrine of substituted judgment is not relevant and may not be applied in this case.

## II

Several courts from sister jurisdictions have addressed the issue whether the consent of a court, parent or guardian, for the removal of a kidney from an incompetent person for transplantation to a sibling, may be le-

gally effective. These cases have been addressed by the parties. While not mandatory authority to this court, these cases are illustrative of the complexities involved when otherwise healthy minors or incompetent persons, who lack the legal capacity to give consent, are asked to undergo an invasive surgical procedure for the benefit of a sibling.

In *Strunk v. Strunk* (Ky. 1969), 445 S.W.2d 145, the Kentucky Court of Appeals, in a 4 to 3 decision, determined that a court of equity had the power to permit a kidney to be removed from a mentally incompetent ward of the State, upon the petition of his committee, his mother, for transplantation into his 28-year-old brother who was dying from a kidney disease. The ward of the State was a 27-year-old man who had the mental capacity of a six-year-old.

The mother petitioned the county court for authority to proceed with the kidney transplant. The county court "found that the operation was necessary, that under the peculiar circumstances of this case it would not only be beneficial to [the ward's brother] but also beneficial to [the ward] because [the ward] was greatly dependent upon [his brother], emotionally and psychologically, and that [the ward's] well-being would be jeopardized more severely by the loss of his brother than by the removal of a kidney." *Strunk*, 445 S.W.2d at 146.

Testimony before the county court included the ward's psychiatrist who opined that the death of the ward's brother would have "an extremely traumatic effect upon [the ward]." (*Strunk*, 445 S.W.2d at 146.) The Department of Mental Health recommended the operation take place, and stressed in its recommendation the importance of the close relationship between the two brothers. Appeal was taken to the circuit court, which adopted the findings of the county court. The circuit court "found that it would be to the best interest of the

ward of the state that the procedure be carried out." *Strunk*, 445 S.W.2d at 147.

The *Strunk* court had before it the recommendation of both of the ward's parents and the Department of Mental Health that the kidney transplant take place. Also before the *Strunk* court was the incompetent person's guardian *ad litem*, who "continually questioned the power of the state to authorize the removal of an organ from the body of an incompetent who is a ward of the state." (*Strunk*, 445 S.W.2d at 147.) The *Strunk* court noted that the case before it was unique, and looked to the doctrine of substituted judgment for guidance.

The *Strunk* court stated:

"The right to act for the incompetent in all cases has become recognized in this country as the doctrine of substituted judgment and is broad enough not only to cover property but also to cover all matters touching on the well-being of the ward. The doctrine has been recognized in American courts since 1844.

'The "doctrine of substituted judgment," which apparently found its first expression in the leading English case of Ex parte Whitebread (1816) 2 Meriv 99, 35 Eng Reprint 878 (Ch), supra §3(a), was amplified in Re Earl of Carysfort (1840) Craig & Ph 76, 41 Eng Reprint 418, where the principle was made to apply to one who was not next of kin of the lunatic but a servant of his who was obliged to retire from his service by reason of age and infirmity. The Lord Chancellor permitted the allowance of an annuity out of the income of the estate of the lunatic earl as a retiring pension to the latter's aged personal servant, although no supporting evidence could be found, the court being "satisfied that the Earl of Carysfort would have approved if he had been capable of acting himself." ' Annot., 24 A.L.R.3d 863 (1969)." *Strunk*, 445 S.W.2d at 148.

The *Strunk* court determined that the statutory "power given to a committee *** would not extend so far as to allow a committee to subject his ward to the se-

rious surgical techniques here under consideration unless the life of his ward be in jeopardy." (*Strunk*, 445 S.W.2d at 149.) However, the *Strunk* court was of "the opinion that a chancery court does have sufficient inherent power to authorize the operation. The circuit court having found that the operative procedures in this instance are to the best interest of [the ward] and this finding having been based upon substantial evidence, we are of the opinion the judgment should be affirmed." *Strunk*, 445 S.W.2d at 149.

The dissent noted that the majority opinion was "predicated upon the authority of an equity court to speak for one who cannot speak for himself" (*Strunk*, 445 S.W.2d at 149 (Steinfeld, J., dissenting)) and "upon the finding of the circuit court that there will be psychological benefits to the ward" (*Strunk*, 445 S.W.2d at 150 (Steinfeld, J., dissenting)). The dissent concluded that it was:

> "unwilling to hold that the gates should be open to permit the removal of an organ from an incompetent for transplant, at least until such time as it is conclusively demonstrated that it will be of significant benefit to the incompetent. The evidence here does not rise to that pinnacle. To hold that committees, guardians or courts have such awesome power even in the persuasive case before us, could establish legal precedent, the dire result of which we cannot fathom. Regretfully I must say no." *Strunk*, 445 S.W.2d at 151 (Steinfeld, J., dissenting).

In *Hart v. Brown* (Super. 1972), 29 Conn. Supp. 368, 289 A.2d 386, the parents of identical twins, age 7 years and 10 months, sought permission to have a kidney from the healthy twin transplanted into the body of the seriously ill twin who was suffering from a kidney disease. The parents brought a declaratory judgment action, as parents and natural guardians of the twins, seeking a declaration that they had the right to consent to the pro-

posed operation. Guardians *ad litem* for each of the twins were appointed. Defendants in the declaratory judgment action were the physicians and the hospital at which the proposed kidney transplantation operation was to take place; the defendants had refused to use their facilities unless the court "declare[d] that the parents and/or guardians ad litem of the minors have the right to give their consent to the operation upon the minor twins." *Hart*, 29 Conn. Supp. at 369, 289 A.2d at 387.

The court in *Hart* concluded it had the power to determine that the parents have the right to consent to the operation "using the doctrines of law as stated in the *Strunk* case, in the *Bonner* case, and in the Massachusetts cases." (*Hart*, 29 Conn. Supp. at 377, 289 A.2d at 391.) The Massachusetts cases referred to by the *Hart* court were unreported cases where the "commonwealth of Massachusetts ruled that a court of equity does have the power to permit the natural parents of minor twins to give their consent to a procedure such as is being contemplated by this court." (*Hart*, 29 Conn. Supp. at 370-71, 289 A.2d at 387.) The *Hart* court stated *Bonner v. Moran* (D.C. Cir. 1941), 126 F.2d 121, was "authority *** that nontherapeutic operations can be legally permitted on a minor as long as the parents or other guardians consent to the procedure." (*Hart*, 29 Conn. Supp. at 376, 289 A.2d at 390.) In *Bonner*, a 15-year-old minor child's consent to removal of a skin patch for the benefit of his cousin was held legally ineffective.

The court in *Hart* noted it was "not being asked to act where a person is legally incompetent. The matter, however, does involve two minors who do not have the legal capacity to consent." (*Hart*, 29 Conn. Supp. at 370, 289 A.2d at 387.) The *Hart* court referred to the *Strunk* court's decision that a court of equity has the power to permit the natural parent of a 27-year-old mental incompetent to give her consent, using the doctrine of substi-

tuted judgment, to a kidney transplantation operation. The court in *Hart* stated:

"The court [in *Strunk*] held that a court of equity does have such power, applying also the 'doctrine of substituted judgment.'

Therefore, this court is of the opinion that it has the power to act in this matter." *Hart*, 29 Conn. Supp. at 371, 289 A.2d at 388.

The *Hart* court reviewed the medical testimony presented concerning the kidney transplant which "indicate[d] that scientifically this type of procedure is a 'perfect' transplant." (*Hart*, 29 Conn. Supp. at 375, 289 A.2d at 389.) The court also noted that a psychiatrist examined the proposed donor and testified the proposed donor "has a strong identification with her twin sister." (*Hart*, 29 Conn. Supp. at 374, 289 A.2d at 389.) Further, the psychiatrist testified "that if the expected successful results are achieved they would be of immense benefit to the donor in that the donor would be better off in a family that was happy than in a family that was distressed and in that it would be a very great loss to the donor if the donee were to die from her illness." (*Hart*, 29 Conn. Supp. at 374-75, 289 A.2d at 389.) The court in *Hart* considered the testimony of the psychiatrist to be "of limited value only because of the ages of the minors." *Hart*, 29 Conn. Supp. at 375, 289 A.2d at 390.

Both guardians *ad litem* gave their consent to the procedure. Both parents gave their consent to the procedure. A clergyperson testified that the natural parents were "making a morally sound decision." (*Hart*, 29 Conn. Supp. at 375, 289 A.2d at 390.) The *Hart* court found the testimony of the parents showed they reached their decision to consent "only after many hours of agonizing consideration." (*Hart*, 29 Conn. Supp. at 375, 289 A.2d at 390.) The twin who would serve as the kidney donor "ha[d] been informed of the operation and insofar

as she may be capable of understanding she desires to donate her kidney so that her sister may return to her." *Hart*, 29 Conn. Supp. at 375, 289 A.2d at 389.

The *Hart* court stated:

> "To prohibit the natural parents and the guardians ad litem of the minor children the right to give their consent under these circumstances, where there is supervision by this court and other persons in examining their judgment, would be most unjust, inequitable and injudicious. Therefore, natural parents of a minor should have the right to give their consent to an isograft kidney transplantation procedure when their motivation and reasoning are favorably reviewed by a community representation which includes a court of equity.
>
> It is the judgment of this court that [the parents] have the right, under the particular facts and circumstances of this matter, to give their consent to the operations." (*Hart*, 29 Conn. Supp. at 378, 289 A.2d at 391.)

Although purporting to apply the doctrine of substituted judgment, the *Hart* court did not inquire as to what the 7½-year-old minors would do if the minors were competent. The *Hart* court instead determined that "the natural parents would be able to substitute their consent for that of their minor children after a close, independent and objective investigation of their motivation and reasoning." *Hart*, 29 Conn. Supp. at 375, 289 A.2d at 390.

In *Little v. Little* (Tex. Civ. 1979), 576 S.W.2d 493, the mother of a 14-year-old mentally incompetent daughter petitioned the court to authorize the mother's consent to the removal of a kidney from her daughter for transplantation into her younger son, who suffered from a kidney disease. The mother had been appointed guardian of her mentally incompetent minor daughter. An attorney *ad litem* was appointed by the court to represent the proposed donor. The attorney *ad litem* argued there was no constitutional or statutory provision empowering the probate court to authorize the removal of an incom-

petent's kidney for the purpose of benefiting another person.

The mother relied on *Strunk.* The *Little* court discussed the doctrine of substituted judgment as it was applied in *Strunk.* The *Little* court also discussed two cases where the court refused to authorize a transplant, *In re Guardianship of Pescinski* (1975), 67 Wis. 2d 4, 226 N.W.2d 180, and *In re Richardson* (La. App. 1973), 284 So. 2d 185.

The court in *Little* stated:

> "It is clear in transplant cases that courts, whether they use the term 'substituted judgment' or not, will consider the benefits to the donor as a basis for permitting an incompetent to donate an organ. Although in *Strunk* the Kentucky Court discussed the substituted judgment doctrine in some detail, the conclusion of the majority there was based on the benefits that the incompetent donor would derive, rather than on the theory that the incompetent would have consented to the transplant if he were competent. We adopt this approach." *Little,* 576 S.W.2d at 498.

The *Little* court determined that "the testimony \*\*\* conclusively establish[ed] the existence of a close relationship between [the proposed donor] and [her brother], a genuine concern by each for the welfare of the other and, at the very least, an awareness by [the proposed donor] of the nature of [her brother's] plight and an awareness of the fact that she is in a position to ameliorate [her brother's] burden." (*Little,* 576 S.W.2d at 498.) Both parents of the incompetent minor consented to the kidney donation; there was no evidence that the incompetent minor had been subjected to family pressure; and there were no medically preferable alternatives to the kidney transplant. The *Little* court also found that the dangers of the operation were minimal and there was evidence the incompetent minor would not suffer psycho-

logical harm. The kidney transplant would probably be substantially beneficial to the proposed recipient, and the trial court's decision was made "only after a full judicial proceeding in which the interests of [the incompetent minor] were championed by an attorney ad litem." (*Little*, 576 S.W.2d at 499.) The *Little* court concluded:

> "Given the presence of all the factors and circumstances outlined above, and limiting our decision to such facts and circumstances, we conclude that the trial court did not exceed its authority by authorizing the participation of [the incompetent minor] in the kidney transplant as a donor, since there is strong evidence to the effect that she will receive substantial psychological benefits from such participation. Nothing in this opinion is to be construed as being applicable to a situation where the proposed [recipient] is not a parent or sibling of the incompetent." *Little*, 576 S.W.2d at 500.

In *Pescinski*, the sister and guardian of an adult incompetent 39-year-old man petitioned the court for permission for the incompetent brother to donate a kidney to another sister suffering from a kidney disease. The incompetent, "classified as a schizophrenic, chronic, catatonic type" (*Pescinski*, 67 Wis. 2d at 6, 226 N.W.2d at 180) for over 17 years, was a mental patient at a State hospital. A physician testified that the ward had a mental capacity of a 12-year-old child. The guardian *ad litem* for the incompetent person would not consent to the procedure.

In *Pescinski*, the supreme court of Wisconsin addressed the issue: "Does a county court have the power to order an operation to be performed to remove a kidney of an incompetent ward, under guardianship of the person, and transfer it to a sister where the dire need of the transfer is established but where no consent has been given by the incompetent or his guardian *ad litem*, nor has any benefit to the ward been shown?" (*Pes-*

*cinski*, 67 Wis. 2d at 5, 226 N.W.2d at 180.) The court answered that it did not.

The *Pescinski* court noted that "no statutory authority [is] given the county court to authorize a kidney transplant or any other surgical procedure on a living person." (*Pescinski*, 67 Wis. 2d at 7, 226 N.W.2d at 181.) The court in *Pescinski* discussed the doctrine of substituted judgment approved by the court in *Strunk*. The *Pescinski* court declined to adopt the doctrine of substituted judgment:

> "An incompetent particularly should have his own interests protected. Certainly no advantage should be taken of him. In the absence of real consent on his part, and in a situation where no benefit to him has been established, we fail to find any authority for the county court, or this court, to approve this operation." *Pescinski*, 67 Wis. 2d at 8-9, 226 N.W.2d at 182.

In *In re Guardianship of Eberhardy* (1981), 102 Wis. 2d 539, 307 N.W.2d 881, the supreme court of Wisconsin discussed its decision in *Pescinski* and clarified that *Pescinski* "should not be read as a ruling of want of jurisdiction" (*Eberhardy*, 102 Wis. 2d at 565 n.13, 307 N.W.2d at 893 n.13) on the part of a court to authorize the kidney transplant therein considered. The court in *Eberhardy* stated:

> "*Pescinski* represents the exercise of judicial restraint under particular circumstances. Those circumstances included the lack of consent of the guardian *ad litem*, no showing of benefit to the ward, and an absence of legislative guidance. *Pescinski* should not be read as a ruling of want of jurisdiction, and, insofar as it may, we disavow that conclusion." *Eberhardy*, 102 Wis. 2d at 565 n.13, 307 N.W.2d at 893 n.13.

The Louisiana Court of Appeal in *In re Richardson* (La. App. 1973), 284 So. 2d 185, declined to adopt the doctrine of substituted judgment announced in *Strunk*. Both parents of a 17-year-old incompetent son with a

mental age of three or four years consented to a kidney transplant from the son to his sister. As a procedural vehicle to bring the issue before the court, the father filed suit against the mother to compel her to consent to the kidney transplant. The *Richardson* court distinguished the case before it from the case in *Strunk*:

"We find the facts in [*Strunk*], particularly the conclusion relative to the 'best interest' of the incompetent, are not similar to the facts in the instant case and we also find that both the procedural and the substantive aspects of the majority opinion are not in accord with Louisiana law." *Richardson*, 284 So. 2d at 187.

The *Richardson* court stated that the law of its State "is designed to protect and promote the ultimate best interest of a minor." (*Richardson*, 284 So. 2d at 187.) Louisiana law did not provide for the *inter vivos* donation of a minor's property either by the minor or by the minor's tutor (guardian). The *Richardson* court stated:

"Since our law affords this unqualified protection against intrustion [*sic*] into a comparatively mere property right, it is inconceivable to us that it affords less protection to a minor's right to be free in his person from bodily intrusion to the extent of loss of an organ unless such loss be in the best interest of the minor. Of course, that statement and our conclusion are restricted to the facts of the present case." *Richardson*, 284 So. 2d at 187.

In the concurring opinion in *Richardson*, it was stated:

"The majority, in my opinion, rightfully assumes that the court is empowered to authorize the transplant of the kidney from the minor, provided certain standards are met, i.e., the best interests of the minor. However, I am of the opinion that before the court might exercise its *awesome* authority in such an instance and before it considers the question of the best interests of the child, certain requirements must be met. I am of the opinion that it must be clearly established that the surgical intrusion is urgent, that there are no reasonable alternatives, and

that the contingencies are minimal. These requirements or prerequisites are not met in this case. Having so determined, we are not confronted with the question of the best interests of the child." (Emphasis in original.) *Richardson*, 284 So. 2d at 188 (Gulotta, J., concurring).

In each of the foregoing cases where consent to the kidney transplant was authorized, regardless whether the authority to consent was to be exercised by the court, a parent or a guardian, the key inquiry was the presence or absence of a benefit to the potential donor. Notwithstanding the language used by the courts in reaching their determination that a transplant may or may not occur, the standard by which the determination was made was whether the transplant would be in the best interest of the child or incompetent person.

The primary benefit to the donor in these cases arises from the relationship existing between the donor and recipient. In *Strunk*, the donor lived in a State institution. The recipient was a brother who served as the donor's only connection with the outside world. In both *Hart* and *Little*, there was evidence that the sibling relationship between the donor and recipient was close. In each of these cases, both parents had given their consent.

We hold that a parent or guardian may give consent on behalf of a minor daughter or son for the child to donate bone marrow to a sibling, only when to do so would be in the minor's best interest.

As sole custodian of the twins, Ms. Curran "may determine the child[ren]'s upbringing, including but not limited to, [the] education, health care and religious training, unless the court, after hearing, finds, upon motion by the noncustodial parent, that the absence of a specific limitation of the custodian's authority would clearly be contrary to the best interests of the child[ren]." Ill. Rev. Stat. 1987, ch. 40, par. 608(a).

Section 608(a) provides that the rights of the custodial parent and noncustodial parent may be "otherwise agreed by the parties in writing at the time of the custody judgment." (Ill. Rev. Stat. 1987, ch. 40, par. 608(a).) Mr. Bosze relies on part B, paragraph 4, of the parentage order as retaining to himself rights equal to, or substantially the same as, Ms. Curran's when it comes to matters of the health and welfare of the twins.

The circuit court determined that Mr. Bosze did not have standing, based on the parentage order, "to compel bone marrow harvesting of the twins for the benefit of Jean Pierre." Part B, paragraph 4, of the parentage order requires Ms. Curran to consult and confer with Mr. Bosze, "with a view toward adopting and following a harmonious policy," in "all matters of importance relating to the health, welfare and education of the children." The circuit court concluded that the word "children" referred only to Allison and James, and had "no bearing whatsoever on the health and welfare of Jean Pierre." We agree. This provision encompasses the rights and responsibilities of Ms. Curran and Mr. Bosze in relation to Allison and James. This provision does not encompass the rights and responsibilities of Ms. Curran in relation to Jean Pierre.

Pursuant to section 608(a), however, Mr. Bosze has standing as a noncustodial parent to petition the circuit court for a "specific limitation of [Ms. Curran's] authority" when the exercise of that authority "would clearly be contrary to the best interests of the child." Ill. Rev. Stat. 1987, ch. 40, par. 608(a).

Mr. Bosze believes Ms. Curran's decision to withhold consent for the twins to donate bone marrow is wrong. Mr. Bosze argued that under the doctrine of substituted judgment, the twins, if competent, would consent to donate bone marrow. Mr. Bosze presented evidence which he contended proved Ms. Curran was wrong in withhold-

ing consent. This evidence, and the evidence presented by Ms. Curran, is sufficient for this court to determine whether, under the facts of this case, it is in the best interests for the twins, or either of them, to donate bone marrow to their half-brother. Mr. Bosze, as the noncustodial parent, has the burden of persuading the court that the withholding of consent by the twins' custodial parent to the proposed bone marrow harvesting procedure is clearly contrary to the best interests of the children. Ill. Rev. Stat. 1987, ch. 40, par. 608(a).

## III

In the case at bar, the circuit court heard extensive testimony from physicians concerning the status of Jean Pierre's condition, and the risks and benefits of donating bone marrow. The physicians also testified concerning consent by a parent or guardian for bone marrow harvesting from a minor child.

Dr. Frank Leonard Johnson, a specialist in treating cancer in children, is the chief of pediatric hematology/oncology at the University of Chicago Medical Center, where he is in charge of the pediatric bone marrow transplant program. Dr. Johnson is also a professor of pediatrics at the University of Chicago. Dr. Johnson has been involved in bone marrow transplantations since 1971. Dr. Johnson's practice consists primarily of treating children who have cancer, including leukemia. Dr. Johnson stated he had participated in at least 500 bone marrow harvesting procedures. Dr. Johnson testified he had reviewed the medical records of Jean Pierre.

Dr. Johnson testified that the decision to perform a bone marrow transplant involves weighing the risks and benefits to the recipient against the risks and benefits to the donor. Dr. Johnson stated that Jean Pierre was misdiagnosed in Colombia in June 1988 as having ALL and not AUL. It was not until October 1988 that Jean Pierre

went into remission. Dr. Johnson stated that the length of time it took for Jean Pierre to achieve remission and the fact that Jean Pierre suffered a testicular relapse while undergoing chemotherapy made his outlook from a prognostic view worse.

According to Dr. Johnson, the results of a bone marrow transplant done during relapse are much worse than a bone marrow transplant done during remission. Dr. Johnson also stated that Jean Pierre's medical records indicated that Jean Pierre had received a blood transfusion from his father while in Colombia. Dr. Johnson stated that if a family blood transfusion occurs before a bone marrow transplant, there is a higher risk of transplanted bone marrow from a family member being rejected. According to Dr. Johnson, Jean Pierre's blood transfusion increased the risks to Jean Pierre in using the twins as donors, because there was an increased risk of Jean Pierre rejecting the transplant.

Dr. Johnson testified that graft-versus-host disease is the major limiting complication of bone marrow transplantation. Graft-versus-host disease is a disease which afflicts the recipient. The graft, that is, the bone marrow, recognizes that it is in a different body and the white cells in the graft attack the skin and bowel lining of the recipient. The skin changes resulting from graft-versus-host disease can be as bad as a third-degree burn. There may be severe abdominal pain and serious liver disease may result. The closer the match between the donor and recipient, the less likely the risk of graft-versus-host disease to the recipient. Dr. Johnson noted that the twins were somewhere between being considered a related donor and being considered an unrelated donor. It was Dr. Johnson's opinion that Jean Pierre would have a 70% to 80% chance of contracting graft-versus-host disease if the twins, or either of them, were to donate bone marrow to Jean Pierre. If the twins donated

bone marrow to Jean Pierre, Dr. Johnson stated there would be a 30% to 40% chance of the graft-versus-host disease being fatal.

Dr. Johnson was asked if he had an opinion whether he would recommend a bone marrow transplant for Jean Pierre. Dr. Johnson testified he would explain to the family that there was, in his opinion:

"at best, optimistically, somewhere between 1 and 5 percent and that you have a 95 percent chance that we could make things worse for your son, okay, and they said we still want to take that chance, okay, I would then say fine.

We would go ahead and hope that this was the rare situation where a child with Jean Pierre's history would survive and be potentially cured. Okay?

If one parent, however, told me I'm not willing to put my other normal children through this procedure, okay, because the odds are it's not going to work and because I'm worried about the risks, whether they're small risks or not, I would respect that decision completely because I think this is the crux of the matter here."

Concerning the risks to the bone marrow donor, Dr. Johnson testified that while the incidence of risk is not very high, the risk is medically significant. When a 3½-year-old child undergoes a bone marrow harvesting procedure, the child is put under general anesthesia. Special needles are put through the skin into the hip bones at the back on both sides of the child and at the front on both sides. Dr. Johnson testified that in order to obtain the amount of bone marrow which would be necessary for a transplant to Jean Pierre, the bone would have to be punctured 100 separate times.

Dr. Johnson's personal experience was that 100% of matched adult siblings have agreed to donate bone marrow to their siblings. Dr. Johnson testified he was aware that both Jean Pierre's father and mother, and Jean Pierre, have consented to the bone marrow transplant.

Further, Dr. Johnson stated that without a bone marrow transplant, he was 99% sure Jean Pierre would die. Assuming the twins were compatible as bone marrow donors, Dr. Johnson testified Jean Pierre would have a 5% chance to live, and "in my own experience I [do] not think he ha[s] a chance." If Jean Pierre were to achieve remission, Dr. Johnson stated that Jean Pierre's chances would be in the range of 10% with a bone marrow transplant.

Dr. Johnson stated that since the twins were 3½-year-old children, they could legally neither give nor refuse consent to the proposed bone marrow transplant. In the absence of legally effective consent, Dr. Johnson would normally turn to the parents.

Dr. Johnson testified he had not and would not harvest bone marrow from a child when a custodial parent of the child did not consent. Dr. Johnson explained he would not do so because:

> "I think the custodial parent has a right to make a decision in a situation where we are putting that child at risk from a surgical procedure that is invasive; and admittedly, it's not a major surgical procedure, the risk from an anesthetic; and admittedly, that risk is small, but there's still a risk there.
>
> And if the parent is that concerned because we have one child who has a very little likelihood of surviving and another child—and they have any [concern] at all that they may lose that child with the procedure, in other words, possibly losing two children, then there's no way in the world that I would force them to be marrow donors."

Dr. Jong Kwon is a licensed physician, board-certified in pediatric hematology and oncology. Dr. Kwon has been Jean Pierre's physician since August 1988.

Jean Pierre was diagnosed as having leukemia in Colombia, South America, in June 1988. Dr. Kwon testified that Jean Pierre did not receive effective therapy in Co-

lombia, and Jean Pierre's condition was probably worsened by the treatment he did receive. Once Jean Pierre was in Dr. Kwon's care, Jean Pierre received chemotherapy and went into remission. Jean Pierre suffered a testicular relapse in January 1990, and a bone marrow relapse in June 1990.

Dr. Kwon now recommends a bone marrow transplant for Jean Pierre. Dr. Kwon stated the recommended treatment of choice for Jean Pierre is a bone marrow transplant because "when the patient is in [Jean Pierre's] kind of condition, the chance of survival is better with a bone marrow transplant than maintaining chemotherapy." It was Dr. Kwon's opinion that Jean Pierre has "a pretty good chance to go into second remission" with chemotherapy; Dr. Kwon estimated this chance to be not more than 50%. If a second remission were achieved, Dr. Kwon stated Jean Pierre's chances with a bone marrow transplant would be "anywhere from 40% percent to plus, minus 10 percent."

Dr. Kwon stated that Jean Pierre's father, mother and older half-brother were tested and found not to be compatible as bone marrow donors for Jean Pierre. Persons on Jean Pierre's mother's side of the family have not yet been tested because most of them live in Colombia, South America. Dr. Kwon stated that a full sibling has a better chance to match as a bone marrow donor than a half-sibling. If there is one full sibling, that sibling has a 25% chance of being a match. If there is a half-sibling, that half-sibling has less than a 1% chance of being a match. In Dr. Kwon's opinion, based on the blood testing of the twins pursuant to the paternity suit, the chances for one or both of the twins to be a match might be as high as 4% or 5%.

If the twins were compatible, then the bone marrow harvesting procedure could occur if there is consent. Dr. Kwon stated that in cases where the donor is a minor,

the consent of both parents is routinely obtained. When asked if he knew whether, in this case, both parents consented to using either or both of the twins for purposes of testing for compatibility, Dr. Kwon stated: "I don't get into those issues."

Based upon his practice and the patients he has seen, Dr. Kwon believed Jean Pierre would survive a bone marrow transplant. Dr. Kwon also stated that it was possible that Jean Pierre might develop graft-versus-host disease and that graft-versus-host disease might cause the premature death of Jean Pierre. Dr. Kwon believed a bone marrow transplant was Jean Pierre's only and best chance to live.

Dr. Bennett Leventhal is a physician and professor of psychiatry and pediatrics, an associate chairperson of the department of psychiatry, and the director of child and adolescent psychiatry at the medical facility at the University of Chicago. Dr. Leventhal has a clinical practice in which 75% to 80% of the patients are children and adolescents.

Dr. Leventhal testified he was made aware of the facts of this case after reading the briefs. Dr. Leventhal stated he had not interviewed either of the twins, Ms. Curran or Mr. Bosze. Dr. Leventhal testified he was not asked to interview the twins, and he did not consider an interview with the twins relevant to his testimony.

Dr. Leventhal testified that 3½-year-old mentally and physically healthy children do not understand abstract concepts such as death because "they just haven't had the opportunity to have cognitive development sufficient to manage things like abstractions, hypotheses, and so on." Concerning whether it would be possible to determine what the values of a 3½-year-old child would be in 10 or 20 or 30 years from the present, Dr. Leventhal testified "the research would suggest that you don't really have to talk to the kids. You just have to talk to

their parents. \*\*\* [M]ost children adopt the views of their parents. That is their primary caretaker."

Dr. Leventhal testified that when a child is to serve as a bone marrow donor, the parents will generally be with the child when the child is put under general anesthesia, and the parents will be with the child when the child wakes up. Dr. Leventhal testified that he has had experience counseling families who have a healthy child who might serve as a donor for another sibling in the family. When asked about the factors which determine potential psychological effects to a 3½-year-old child being a bone marrow donor, Dr. Leventhal testified:

> "Well, there are a number. Probably the first and foremost is the ability of the important adults in the child's life to support them through that process. Clearly the most important adult of all is the children's primary caretaker. In the general sense that's usually mother and father, but it varies somewhat."

Concerning the impact it would have if one of the twins were required to submit to the bone marrow harvesting procedure over the objection of Ms. Curran, Dr. Leventhal stated:

> "[I]n my clinical judgment, that's the single most salient issue here. The mother's inability for whatever reason to concur and to support this process probably puts the—not probably, almost certainly puts the children at very serious risks for having adverse psychological consequences or results of this procedure.
>
> \* \* \*
>
> \*\*\* [T]hat would be a very serious problem. Children at the age of three, between two and three and a half, four, sometimes they have very serious difficulties with the prolonged separations, particularly if those separations take place under very emotional circumstances. That is, they're not planned for, or the parent can't support it.
>
> \* \* \*
>
> I think it's an intrinsic part of the comments I made

earlier about the need for parental support to optimize an outcome of a situation like this, and the children to be separated from their mother would certainly deny a substantial part of that support."

It was Dr. Leventhal's opinion that if the court ordered the twins to submit to the bone marrow harvesting procedure, and Ms. Curran pretended to support the twins during the harvesting procedure when she was really opposed to it, problems could result. Dr. Leventhal stated:

"I think that would be more difficult. What happens then is the mother would not be supporting the procedure. The twins would not know if they can rely on the mother's emotional expression as a guide for things that would be safe or dangerous for them or good or bad for them. It might compromise her relationship with the children and leave them floating in a netherland in this matter."

Concerning whether the twins would suffer guilt if they found out that Jean Pierre died and that they did not, as 3½-year-old children, donate bone marrow to him, Dr. Leventhal stated:

"Well, that wouldn't—would almost certainly entirely depend on how the parents presented it to the children. If the children are told you could have saved this boy's life, it's your fault, they'll feel guilt ridden. If it's presented to them, on the other hand, that it's a tough decision, someone made it, and the adults did it, and we appreciate your thinking about it, the children will handle it just fine."

In response to whether there were any psychological benefits which could be predicted to the twins 10 or 20 or more years in the future, if the twins were to donate bone marrow at age 3½, Dr. Leventhal stated there were not.

Dr. Leventhal testified as to his opinion on the probable psychological benefits and risks *vis-a-vis* the proposed bone marrow harvesting procedure and the twins:

> "[T]he way we think about it in medicine is basically a risk-benefit ratio, and the benefits are probably very small in comparison to the risks. And it would be my view that the likely psychological benefits would be probably relatively small, whereas given the present circumstances, the psychological risks would be substantial."

Upon cross-examination, Dr. Leventhal was questioned about his counseling of families in which a sibling was being prepared to serve as a bone marrow donor to another sibling. Dr. Leventhal was asked: "In your experience in counseling families and donors, it's not difficult to persuade someone to donate bone marrow, is it?" Dr. Leventhal testified in response: "Not terribly difficult. Most people inherently want to do it, to—just because there's relatively little risk and so—even though it hurts."

When asked by the guardian *ad litem* for the twins whether there was much importance placed on the nature of the bond between siblings in counseling prospective bone marrow donors, Dr. Leventhal answered: "The type of relationship that exists between the donor and the recipient and the closeness of that relationship *** does play a very significant role." Based on the facts as Dr. Leventhal knew them to be from reading the briefs, Dr. Leventhal stated: "I think within a reasonable degree of certainty, it's not likely that [the relationship between Jean Pierre and the twins] is a traditional sibling relationship."

Dr. Leventhal was asked, based on the facts as he knew them, whether the twins would receive any benefits from donating bone marrow. Dr. Leventhal stated:

> "In the long term, it would depend on a whole variety of things. One is the parents' response and support. Sec-

ondly, if Jean-Pierre lived, if they came to know him. If Jean-Pierre died, what they were told and how they were managed during that experience. And then there are a whole variety of life experiences that could intervene that we couldn't even anticipate."

When Dr. Leventhal was asked by Ms. Curran whether, given the facts as known to him, he would suggest the twins undergo the bone marrow harvesting procedure notwithstanding the refusal of consent by the primary caregiver, Dr. Leventhal stated: "No. I would think that children shouldn't undergo these procedures."

In response to a question by Mr. Bosze during recross examination, Dr. Leventhal stated that his conclusions were based on the facts available to him. Included in the set of facts upon which Dr. Leventhal relied in drawing his conclusions were the lack of an appreciable familial relationship between Jean Pierre and the twins and Ms. Curran's opposition to the proposed bone marrow harvesting procedure. Dr. Leventhal stated: "If Miss Curran were involved in counseling and were to change her view and were able to support the children, we wouldn't be sitting here." If any of the assumptions upon which Dr. Leventhal relied were changed, Dr. Leventhal testified his conclusions would change.

In response to a question by the guardian *ad litem* for the twins concerning whether, with a reasonable degree of certainty, it could be predicted what a 3½-year-old child would do at age 18, if the child were called upon to save the life of another at some personal sacrifice to the child, Dr. Leventhal answered:

"I think that the safest—The correct way to answer the question is that it is—At the age of three and a half, it is very difficult if not impossible to predict what a specific individual will do in a specific circumstance at a specific point in time in the future. One, we would never know all the contingencies that might exist at that point in time and all the intervening variables.

What you can in a general sense predict are the kinds of characteristics that individual would have, but not specifically you could not."

Dr. Jay Lance Lechtor is an anesthesiologist in charge of pediatric anesthesia at the University of Chicago. It was stipulated between the parties that Dr. Lechtor would limit his testimony to anesthesiology. Dr. Lechtor stated that there were three different areas of risk to a healthy child who donates bone marrow:

"One, the risk of anesthesia per se; secondly, with a bone marrow harvest there are many times the donors receive blood, so there is the risk of blood transfusion; and, finally, there are psychological risks that are associated with the administration of anesthesia."

According to Dr. Lechtor, the anesthesia itself has transient risks, including nausea and vomiting, headaches, sore throat and drowsiness. Dr. Lechtor indicated the risk of death from an anesthetic "would be in the range of one to ten thousand to one in one hundred thousand, and that risk admittedly is very low, but when that is the individual who that occurs to, if that one person dies, that is to that individual *** a very great risk."

According to Dr. Lechtor, consent on behalf of a child to undergo general anesthesia should come from the caretakers of the child: "The person who is psychologically bonded with the child. *** I think there has to be appropriate counseling and bonding between the parent and the child to explain the procedure to the child and to lessen the anxiety that the child experiences." Dr. Lechtor acknowledged that the active involvement and cooperation of the bonding parent is required.

Dr. Camitta is a professor of pediatrics at the Medical College of Wisconsin, and director of hematology and oncology at Children's Hospital of Wisconsin. Dr. Camitta previously had an academic appointment at Harvard, and had been on the staff at Children's Hospital in Bos-

ton. Dr. Camitta has been performing bone marrow transplants for 18 years. Dr. Camitta has a particular interest in the issue of consent on behalf of children to undergo a bone marrow donation.

Dr. Camitta was at Children's Hospital in Boston when he started performing bone marrow transplants. At that time, the only possible candidate to be a donor was a family member of the recipient. When the potential bone marrow donor was a minor sibling, the parents of the minor would have to consent to the procedure. There was concern that a possible conflict of interest on the part of parents of both an ill child in need of a bone marrow transplant and a healthy child who was a potential donor for his or her sibling:

> "The concern was that the parent had both a sick child and a healthy child, and in their desire for the sick child to get better, they might subject—overlook the potential risks to the healthy child."

In order to address this possible conflict, Dr. Camitta stated: "[W]e went to court and asked the court to have a guardian appointed for the healthy donor to oversee the adequacy of the consent." Dr. Camitta stated that the purpose of this review process was

> "to be certain that the donor child had been adequately evaluated as a transplant candidate; that the risks and benefits had been adequately explained to the parents and to the child in an age-specific manner; and that the decision of the family was consonant with those facts."

Further, it was thought that this review process could serve to "affirm that the parents do not have—the potential conflict of interest has not clouded their judgment in making that decision." A part of this inquiry is the motivation of the parents. Dr. Camitta was unaware of any case where the siblings involved lived in separate households, following a divorce or separation between the parents.

Concerning the risks and benefits of a bone marrow transplant from the perspective of the donor, Dr. Camitta stated the most potentially serious risk was the risk of death associated with an anesthesia, which is 1 in 10,000. This risk is inherent with any type of procedure which involves general anesthesia. Dr. Camitta stated that there is no physical benefit to the bone marrow donor. Dr. Camitta testified that pain following the harvesting procedure is usually easily controlled with postoperative medication. The risk of infection at the needle puncture site is very rare. The possible risk resulting from a blood transfusion is lessened by using an autologous transfusion or by using blood from a family member.

Concerning psychological risks to the donor, Dr. Camitta stated that the donor may be afraid of what will happen. According to Dr. Camitta, the psychological risk to the donor following the bone marrow transplant "has to do mainly with the health of the *** recipient. If the recipient does poorly, then the donor might feel responsible for that." Dr. Camitta acknowledged that this was rare, and usually "[t]he donors, regardless of the outcome, feel this was a positive thing that they have done and would donate again, given the same opportunity."

Dr. Camitta testified to steps that can be taken to manage the psychological risk of fear of the procedure when the donor is a 3½-year-old child:

"The very young donor is going to be afraid to come into the hospital, just like any three and a half year old would be. We show them the place that they'll be staying. In many cases we'll take them up to the operating room and show them that. We can use play therapy with a doll or with a teddy bear, and we try to make that—We have facilities for the parent to stay with the child both before and after the procedure."

Concerning psychological benefits to a bone marrow donor, Dr. Camitta testified:

"The major benefits of donating bone marrow are two: One, the altruistic benefit of having the opportunity to save another person's life; and secondly, depending upon the relationship of the donor and recipient, the advantage of having that person to grow up with."

It was Dr. Camitta's opinion that altruism on the part of a donor is an important benefit to the donor.

Dr. Camitta stated that when a bone marrow transplant is an option, "[T]he options [are presented] to the family, what the possible treatments are, what the risks are and what the benefits are, and we ask them to help us make a decision." Dr. Camitta testified that a bone marrow transplant is usually considered when it is "the treatment of choice, and therefore, the vast majority of times when we go through this process, the families agree to a bone marrow transplant."

Dr. Camitta stated that the overall chance of success of a bone marrow transplant is approximately 15% when a related donor is used for a child in relapse. If a patient is in remission after having had several relapses and receives bone marrow from a related matched donor, Dr. Camitta stated the overall chance of success would be 25% to 30%.

Dr. Camitta stated that in this case, he was aware Jean Pierre's father would like for the twins to participate in the bone marrow transplant and the twins' primary caregiver, their mother, would not. Dr. Camitta testified that under usual circumstances, if there are two parents, he would try to obtain the consent of both parents for one of their children to serve as a bone marrow donor. In cases where

"it is a nuclear family and the family is all together, *** one should safeguard the child to make sure that the parents' decision is correct.

> If the family is not a nuclear family or there are disagreements between two parents, even within a nuclear family, then I think it is even more appropriate under those circumstances that some outside party review the consent process and see whether it seems reasonable."

If there were only one parent involved in the decisionmaking process of consenting or refusing to consent to a child's serving as a bone marrow donor, and that parent refused, Dr. Camitta stated he "would \*\*\* try to talk to the parent and make sure that the parent's objection was a rational one. If it was a rational one," the objection of the parent would generally be respected. A rational decision "means knowledge of whatever the circumstance is and then using reasoning to come to some conclusion." Dr. Camitta acknowledged that it would be important to know whether the parent accurately understood, from a medical perspective, the extent of risk which would be involved to the potential donor. If only one parent were involved, and that one parent was truly and accurately informed, Dr. Camitta acknowledged it was his opinion that the one parent's decision should stand on behalf of the child. In order for Dr. Camitta to petition a court or ask for a guardian to intervene on behalf of a prospective donor child if the parent had refused consent, Dr. Camitta stated: "It would have to be a very extreme set of circumstances, and that has never occurred."

Dr. Camitta stated that while "[i]t would still be appropriate and ideal to have the primary care-giver participate in the [bone marrow harvesting] process," there have been "a few cases \*\*\* where the primary caregiver was not able to be present because of physical injury or other problems, [and] the donors have done well." If the primary caregiver were not able to participate because of opposition to the child's serving as a bone marrow donor, that would be one of a number of

factors Dr. Camitta would evaluate "as part of a procedure for determining whether a transplant should go ahead."

Dr. Camitta's testimony concerned the donation of bone marrow between full siblings. The guardian *ad litem* for the twins asked Dr. Camitta whether he knew of any statistics regarding the success or failure or risks and benefits of the donation of bone marrow to half-siblings; Dr. Camitta stated he did not.

Dr. Arthur Kohrman has been a physician for 21 years and is director of LaRabida Children's Hospital and Research Center. Dr. Kohrman is a professor and associate chairperson of the department of pediatrics at the University of Chicago. He is chairperson of the pediatrics ethics committee and chairperson of the Institutional Review Board of the division of biological sciences at the University of Chicago. Dr. Kohrman is also chairperson of the committee on bioethics of the American Academy of Pediatrics of the National Organization of Pediatricians. Dr. Kohrman's clinical practice concentrates in pediatric endocrinology.

Concerning the issue of consent to medical procedures on children, Dr. Kohrman stated:

"It is the standard that no procedure shall be done on individuals without their informed consent, and when the issue is related to children, we have a little more complicated situation in that when children are of an age or capability which they cannot clearly understand the implications of what is to be done to them or with them, our society and law have established that the guardian parent has the right to act on behalf of the child in giving or refusing consent.

My activities in the various committees that I work on is to assure that that procedure is performed appropriately and that the procedures, whether therapeutic or research procedures that are proposed, are in the child's best interests and within the boundaries of the expecta-

tion that the person consenting for the child is as well informed and is also acting in the best interest, as they see it, of their child."

Dr. Kohrman acknowledged that a typical 3½-year-old child does not have the ability to consent to a medical procedure, and consent is usually determined by "ascertaining who is the legally responsible individual who can—or individuals who can give consent. The usual presumption is that it is the parents, and absent that, then we would go through a procedure to determine who the responsible individual is."

Dr. Kohrman stated he became familiar with the facts of the case at bar by reading the briefs and by discussing the case with the attorneys. Dr. Kohrman testified he would disagree with a decision by the court ordering the twins to participate in the bone marrow harvesting procedure over the objection of Ms. Curran:

"[b]ecause I think it violates very basic principles, protection of privacy of the individuals and of the very basic principle that our society has agreed upon, that in the absence of competent [consent] on the part of small children, a caring parent is the next best person to give such consent ***."

Dr. Kohrman, in answering the question whether it is ethically appropriate to weigh the potential benefit from the bone marrow transplant to Jean Pierre against the risk to the twins in determining whether the procedure should take place, stated:

"I think to measure the benefits to one individual against the risks to another is to get on a very slippery slope of determining relative worth of individuals in our society, and as such, I think it opens the door to a series of potentially very frightening consequences.

Much more so than in this circumstance in which one might emotionally feel that saving—that discomforting the life of one child to save the life of another was a small trade-off.

But I think the principle that would be broken—would be breached in doing that; that is, the principle of valuing one person's discomfort against another person's benefit, is a fundamentally very important principle that we cannot, as a society, and particularly in the case of children, enter into. We have to approach all children as if they have equal worth."

During cross-examination by Mr. Bosze, Dr. Kohrman acknowledged that he had stated in a previous deposition that it is only proper for a child to donate a kidney to another on two conditions: when there is consent by the parents and where there is assent by the child. Dr. Kohrman agreed that he has ethical reservations about performing a procedure on children without their assent when such assent is attainable; this includes bone marrow harvesting from a child. While Dr. Kohrman testified he "[could] conceive of a circumstance" in which he would perform a bone marrow harvesting procedure upon a child without the informed assent of the child, he stated such a circumstance "would make me very uncomfortable."

Concerning his ethical reservations, Dr. Kohrman stated:

"We do many things in medicine that are uncomfortable. It is based—based upon my belief that the only *** totally ethically appropriate circumstance, that is, in which both the consent of the guardian and parents, or parent, and the assent of the child is obtained, that anything that reduces that makes me uncomfortable.

That does not mean that these things are not done nor does it mean that there are not circumstances in which I would not support their being done."

The guardian *ad litem* for Jean Pierre questioned Dr. Kohrman concerning the procedures Dr. Kohrman followed in evaluating the consent of parents on behalf of their child to a medical procedure. Dr. Kohrman acknowledged he would attempt to ascertain whether the

parent of the child was acting in the child's best interests. An essential part of this process would be to interview the parent and observe the child and the interaction between the child and the parent to see "whether or not this parent was acting in the best interests of [the] child, whether there was a close relationship or not."

Dr. Kohrman did not interview Mr. Bosze, Ms. Curran, Jean Pierre or either of the twins. In cases where it is to be determined whether legally effective consent exists on behalf of a donor child for a transplant to a sibling, Dr. Kohrman would observe how the donor and recipient interreacted. Dr. Kohrman stated this would be part of the data looked at "[b]ut [it would] probably [be] more as indirect evidence of the integrity of the family and of the, if you will, the seemingness of the community of best interests of the donor child and the recipient child."

The guardian *ad litem* for Jean Pierre asked Dr. Kohrman whether he had ever come across a parent who had a motive of malice toward another parent which superseded and was paramount to the best interest of the child. Dr. Kohrman answered that he had seen this circumstance but could not recall the specifics of the case.

Dr. Kohrman recognized a distinction between cases where parents, based on religious grounds, objected to medical treatment to a sick child, and where a parent objects to a medical procedure for a healthy child for the benefit of another. The former circumstance involves a case where "the withholding of medical treatment with *** an extremely high probability of benefit, would endanger the life of that child." The latter circumstance involves "the infliction of a procedure on a previously well child." Dr. Kohrman stated: "These are vastly different ethical domains."

Dr. Kohrman was asked by the guardian *ad litem* for Jean Pierre if Dr. Kohrman's answer would be in any

way different if the focus were placed on the withholding of a medical treatment, with a high probability of benefits, from a recipient child. Dr. Kohrman responded: "If the treatment were not to be obtained as proposed in this case, at the expense of another child, a well child. *** [O]ne cannot look at the recipient in this circumstance without figuring out where the treatment comes from."

Dr. Kohrman was aware of the doctrine of substituted judgment and the opinion of this court in *Longeway*. Dr. Kohrman acknowledged that he was not a lawyer and expressed his opinion that the doctrine of substituted judgment did not apply in the circumstances presented by the case at bar. If the court were to apply the doctrine of substituted judgment and direct that the twins would consent to the proposed bone marrow harvesting procedure, Dr. Kohrman stated he "would make sure it didn't happen in" the institution where he worked.

Ms. Curran asked Dr. Kohrman why, in his opinion, the doctrine of substituted judgment did not apply to this case. Dr. Kohrman answered: "In the Longeway case the substituted judgment was an attempt to find what the wishes of a previously competent adult would have been." Dr. Kohrman further stated: "I think in this circumstance we are looking at the best interests of well children and for whom there is no belief that any intervention could have any significant positive benefit for them."

Dr. Kohrman indicated it would not be possible to adequately predict what a 3½-year-old child's behavior would be like at age 18 by interviewing the child. Dr. Kohrman stated: "I think that the *** intervening developmental years make all bets off. *** I think that one can predict very little from the behavior of a child as to their ultimate adult *** value systems or behavior."

Ms. Curran asked Dr. Kohrman if it would be appropriate to interview a parent to determine what that parent's motive was for asking that the parent's child or children submit to a surgical procedure which required general anesthesia, and whether that motive would be important in determining whether that parent was acting in the best interest of the potential child donor. Dr. Kohrman answered that this would be a factor, but stated he did not think this applied to his concerns in this case. Dr. Kohrman stated his reason for this:

"I think my concerns in this case have to deal with the principle of the invasion of the protections of children's autonomy that have been provided historically and legally, which I think are met in this circumstance.

I don't think the issue of motives, as I testified earlier, really becomes an issue here, as long as the legally constituted guardian of these children is acting in an informed and best-interest way for these children."

The guardian *ad litem* for Jean Pierre asked Dr. Kohrman what he would do in a bone marrow transplant case where one parent consented to the transplant and one parent refused to consent to the transplant. Dr. Kohrman stated he would probably ask a court to appoint guardians *ad litem* for the children and have the case be adjudicated in court, assuming each parent had equal legal standing on behalf of the child.

The guardian *ad litem* for Jean Pierre asked Dr. Kohrman which parent he would agree with if he were the person who had to decide between the two disagreeing parents. Dr. Kohrman stated:

"I would have a preference, but there is a difference between having a preference and coercing one or another of the parties, and I don't think it is in the purview of medicine to coerce people who have arrived at decisions fully informed which they believe are in the best interests of their children, and that is—it is that residual thing that, unfortunately, ends up in courtrooms like this."

Dr. Kohrman stated that he was being asked "to answer a question for which I don't have an answer."

## IV

The testimony of several witnesses called by Mr. Bosze, including three mothers of children who had donated bone marrow to a sibling suffering from leukemia, a brother who donated bone marrow to his sister, and a brother who received bone marrow from his brother, illustrate the personal nature of the decision to be a bone marrow donor.

Mr. Steven Epstein, who is 48 years old, suffered from non-Hodgkin's lymphoma. It was eventually decided that Mr. Epstein needed a bone marrow transplant. Mr. Epstein's brother, who was around 40 years old at the time, consented to donate bone marrow for Mr. Epstein. The day after Mr. Epstein's brother donated his bone marrow, he came to see Mr. Epstein. After the bone marrow transplant, Mr. Epstein became very ill with graft-versus-host disease. Mr. Epstein did not have a functioning immune system at this time. Sometime later, Mr. Epstein's brother again consented to donate bone marrow for another transplant to Mr. Epstein. For the 85 days following the second bone marrow transplant, Mr. Epstein did not have an immune system, but after that, Mr. Epstein's immune system started to function again. Mr. Epstein referred to this as a miracle.

For three years following the second bone marrow transplant, Mr. Epstein suffered from chronic graft-versus-host disease. Mr. Epstein is now free from disease and leads a normal life, which includes engaging in a wide variety of activities and seeing his brother.

Ms. Janet Heumann is a mother of three children. One of her children had ALL. Another child, who was

two years old at the time, was tested and found to be a perfect match. Ms. Heumann and her husband consented to this child's being a bone marrow donor for the child suffering from ALL. One of the physicians who counseled Ms. Heumann about the possible risks of donating bone marrow was Dr. Johnson. Ms. Heumann stated she had no difficulty in reaching the decision to consent to the bone marrow donation. No one questioned her right to make that decision.

The child who received the bone marrow from his sibling, now eight years old, is doing very well. Ms. Heumann would allow her child to donate bone marrow again, and would definitely recommend that others do so also. Ms. Heumann testified she consented to the procedure "because the risks were very slim and my son's life was at stake." Before and after the bone marrow transplant, Ms. Heumann, her husband, and the children were a close family residing together in the same house. The 2-year-old child who donated the bone marrow and the recipient child had a very close relationship.

The guardian *ad litem* for Jean Pierre asked Ms. Heumann whether she still would have consented to having the bone marrow transplant done if her husband was against the procedure. Ms. Heumann stated she definitely would have had the procedure done "to save my son." The guardian *ad litem* for Jean Pierre also asked Ms. Heumann whether she would have acquiesced to the procedure if her husband was in favor of it and she was against it. Ms. Heumann testified she definitely would have acquiesced "to save our son. To save his life."

Ms. Maureen Watowicz is the mother of two children. When the youngest child was one year old, he donated bone marrow to his 3-year-old brother, who suffered from leukemia. The older brother is now cured. Ms. Watowicz and her husband consented to the bone marrow transplant. Ms. Watowicz did not hesitate in reaching the

conclusion that the bone marrow transplant should take place. Ms. Watowicz has no regrets about the transplant, and if it were necessary, would consent to having it done again. Ms. Watowicz would recommend that others do the same thing. Ms. Watowicz described her family as close.

The guardian *ad litem* for Jean Pierre asked Ms. Watowicz, if her husband had not consented to the bone marrow transplant, whether she would have gone ahead with the transplant; Ms. Watowicz said she would. The guardian *ad litem* for Jean Pierre asked Ms. Watowicz, if she and her husband were separated, and her husband had custody of the children, whether she would have consented to the procedure. Ms. Watowicz testified she would have consented "because it has nothing to do with me and my husband. It has to do with the two siblings. And it has to do with the chance of a life."

Ms. Watowicz testified she believed she had been told that there was a 90% chance of a cure for her son if he underwent the bone marrow transplant. In response to questioning from Mr. Bosze, Ms. Watowicz testified that if she had been told the chance for cure was only 5%, her decision would not have been different "because if there was just one quarter percent, there was that chance, and I had hope."

Ms. Judy Swanson is the mother of four children. Ms. Swanson's 15-year-old son, Steve, donated bone marrow to his 17-year-old sister, Bonnie, who was suffering from leukemia. Ms. Swanson, her husband, and two other of their children had all been tested for compatibility to be bone marrow donors and were found not to be compatible.

Ms. Swanson and her husband consented to the bone marrow transplant and would do it again because "it was the right decision for us." Although Bonnie died nine months after the transplant, Ms. Swanson did not

have any regrets "because we would have lost her right away." Ms. Swanson testified that Steve and Bonnie loved each other.

The brother who donated bone marrow, Steve Swanson, also testified. At the time of the hearing, Steve was 20 years old. Steve testified he donated bone marrow to his sister to give her "extra time in life." He stated that donating "made me feel good in a way that, you know, I could help her out." Steve had been told by the doctors about the operation, and did not have any fears about being a bone marrow donor. After the procedure, his hips were sore for a couple of days. Steve was glad he donated bone marrow for his sister, and would do it again. Steve had a close relationship with his sister.

The guardian *ad litem* for Jean Pierre asked Steve how he would have felt if his parents had not told him until after his sister died that he might have helped save her. Steve stated: "[I] probably would have been pretty upset *** because I had a chance to help her out, and I couldn't do that. I was kept from doing it."

The evidence reveals three critical factors which are necessary to a determination that it will be in the best interests of a child to donate bone marrow to a sibling. First, the parent who consents on behalf of the child must be informed of the risks and benefits inherent in the bone marrow harvesting procedure to the child.

Second, there must be emotional support available to the child from the person or persons who take care of the child. The testimony reveals that a child who is to undergo general anesthesia and the bone marrow harvesting procedure needs the emotional support of a person whom the child loves and trusts. A child who is to donate bone marrow is required to go to an unfamiliar place and meet with unfamiliar people. Depending upon the age of the child, he or she may or may not understand what is to happen. The evidence establishes that

the presence and emotional support by the child's caretaker is important to ease the fears associated with such an unfamiliar procedure.

Third, there must be an existing, close relationship between the donor and recipient. The evidence clearly shows that there is no physical benefit to a donor child. If there is any benefit to a child who donates bone marrow to a sibling it will be a psychological benefit. According to the evidence, the psychological benefit is not simply one of personal, individual altruism in an abstract theoretical sense, although that may be a factor.

The psychological benefit is grounded firmly in the fact that the donor and recipient are known to each other as family. Only where there is an existing relationship between a healthy child and his or her ill sister or brother may a psychological benefit to the child from donating bone marrow to a sibling realistically be found to exist. The evidence establishes that it is the existing sibling relationship, as well as the potential for a continuing sibling relationship, which forms the context in which it may be determined that it will be in the best interests of the child to undergo a bone marrow harvesting procedure for a sibling.

Both Mr. Bosze and Ms. Curran are informed of the risks inherent in a bone marrow harvesting procedure performed on a child. Mr. Bosze has consulted with Dr. Kwon, Jean Pierre's treating physician. Ms. Curran has consulted with the twins' pediatrician, parents of bone marrow donors, and bone marrow donors. Both Ms. Curran and Mr. Bosze listened to Drs. Johnson, Kwon, Leventhal, Lechtor, Camitta, and Kohrman.

The primary risk to a bone marrow donor is the risk associated with undergoing general anesthesia. The risk of a life-threatening complication occurring from undergoing general anesthesia is 1 in 10,000. As noted by the circuit court, the risks associated with general anesthesia

include, but are not limited to, "brain damage as a result of oxygen deprivation, stroke, cardiac arrest and death."

The pain following the harvesting procedure is usually easily controlled with postoperative medication. Although there is a risk of infection at the needle puncture site, this is rare.

Ms. Curran has refused consent on behalf of the twins to the bone marrow transplant because she does not think it is in their best interests to subject them to the risks and pains involved in undergoing general anesthesia and the harvesting procedure. While Ms. Curran is aware that the risks involved in donating bone marrow and undergoing general anesthesia are small, she also is aware that when such risk occurs, it may be life-threatening.

On February 16, 1989, Mr. Bosze and Ms. Curran agreed in the parentage order that Ms. Curran would have sole custody of the twins. Allison and James have lived with Ms. Curran and their maternal grandmother since their birth. Mr. Bosze and Ms. Curran also agreed that Mr. Bosze would have visitation rights with the twins. Until the twins reached the age of five years, Mr. Bosze would have visitation once a week. Ms. Curran was to be present during the visitation.

Between February 16, 1989, and February 14, 1990, Mr. Bosze exercised his visitation rights 15 times. On two of these occasions, Jean Pierre was present. Before Mr. Bosze ever requested Ms. Curran to consent to the twins' donating bone marrow to Jean Pierre, Ms. Curran requested that Mr. Bosze not tell the twins that Jean Pierre was their half-brother. Ms. Curran thought that it would be confusing to the twins to be told that they have two half-brothers and a half-sister, each of whom had a different mother. Mr. Bosze honored this request.

It is a fact that the twins and Jean Pierre share the same biological father. There was no evidence produced,

however, to indicate that the twins and Jean Pierre are known to each other as family.

Allison and James would need the emotional support of their primary caregiver if they were to donate bone marrow. The evidence establishes that it would not be in a 3½-year-old child's best interests if he or she were required to go to a hospital and undergo all that is involved with the bone marrow harvesting procedure without the constant reassurance and support by a familiar adult known and trusted by the child.

Not only is Ms. Curran presently the twins' primary caretaker, the evidence establishes she is the only caretaker the twins have ever known. Ms. Curran has refused to consent to the twins' participation in donating bone marrow to Jean Pierre. It appears that Mr. Bosze would be unable to substitute his support for the procedure for that of Ms. Curran because his involvement in the lives of Allison and James has, to this point, been a limited one.

The guardian *ad litem* for the twins recommends that it is not in the best interests of either Allison or James to undergo the proposed bone marrow harvesting procedure in the absence of an existing, close relationship with the recipient, Jean Pierre, and over the objection of their primary caretaker, Ms. Curran. Because the evidence presented supports this recommendation, we agree.

Mr. Bosze argued that the twins should be required to submit to the Human Leukocyte Antigen (HLA) blood test necessary to determine whether they or either of them is compatible as bone marrow donors for Jean Pierre. Mr. Bosze argues that Supreme Court Rule 215(a) (107 Ill. 2d R. 215(a)) requires such a result.

Supreme Court Rule 215(a) authorizes a court to order a party to submit to a physical examination when the physical condition of that party is in controversy.

The circuit court concluded that the issue of the HLA blood test should not be bifurcated from the issue whether it is appropriate, under the circumstances, for the twins to donate bone marrow. Since there is no reason to order the HLA blood test if it is not appropriate for the twins to donate bone marrow, the circuit court properly refused to bifurcate these issues.

This court shares the opinion of the circuit court that Jean Pierre's situation "evokes sympathy from all who've heard [it]." No matter how small the hope that a bone marrow transplant will cure Jean Pierre, the fact remains that without the transplant, Jean Pierre will almost certainly die. The sympathy felt by this court, the circuit court, and all those who have learned of Jean Pierre's tragic situation cannot, however, obscure the fact that, under the circumstances presented in the case at bar, it would be neither proper under existing law nor in the best interests of the 3½-year-old twins for the twins to participate in the bone marrow harvesting procedure.

On September 28, 1990, this court entered an order affirming the judgment of the circuit court, with opinion to follow, and now, for the foregoing reasons, we reaffirm our previous order. For purposes of computing time limits for any further proceedings, the date of the filing of this opinion shall control.

*Circuit court affirmed.*