*In re* A.M.P., a Minor (Cora Plank *et al.*, Petitioners-Appellees, v. A.M.P., a Minor, Respondent-Appellant).

Fourth District    No. 4—98—0826

Opinion filed March 26, 1999.

Jeff M. Plesko, of Guardianship & Advocacy Commission, of Anna, for appellant.

Deborah Frank Feinen, of Nally, Haasis, Jordan & Bauer, P.C., of Champaign, for appellees.

JUSTICE GARMAN delivered the opinion of the court:

Petitioners are parents of respondent, A.M.P., a 16-year-old young woman who is psychotic and noncommunicative. This action arose on their petition for authorization of electroconvulsive therapy (ECT) upon A.M.P., after she failed to respond to other forms of therapy. The trial court entered an order authorizing treatment and, on motion by respondent's appointed counsel, directed the clerk to prepare and file a notice of appeal. The trial court appointed the Legal Advocacy Service, Illinois Guardianship and Advocacy Commission, to represent respondent on appeal. Court-appointed appellate counsel now moves to withdraw, pursuant to *Anders v. California*, 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396 (1967), and *In re McQueen*, 145 Ill. App. 3d 148, 495 N.E.2d 128 (1986). Respondent was served with the motion. On its own motion, this court granted respondent leave to file additional points and authorities on or before December 9, 1998. None have been filed. We have reviewed counsel's brief and thoroughly examined the record in accordance with the dictates of Anders. We affirm the judgment of the trial court and grant counsel's motion to withdraw.

## I. BACKGROUND

A.M.P. had some developmental disabilities prior to a seizure-like episode. After the episode, her condition worsened. She became noncommunicative and her ability to function in daily life deteriorated. At times her behavior was manic; at other times, catatonic. A.M.P. did not respond to trials of various medications. She was admitted to an inpatient facility when her behavior made it impossible for her parents to care for her at home. Eventually, Dr. Timothy Roberts suggested ECT, in view of the ineffectiveness of medications and the prospect of long-term institutionalization if her condition did not improve.

Her parents brought an emergency petition pursuant to the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1—100 et seq. (West 1996)), seeking court approval of their consent to the administration of ECT upon A.M.P. Recognizing that the statutory provision pertaining to ECT upon minors or persons subject to guardianship (405 ILCS 5/2—110 (West 1996)) has been held unconstitutional (*In re Branning*, 285 Ill. App. 3d 405, 674 N.E.2d 463 (1996)), the parents brought this action "to fully protect the due process rights of [A.M.P.]."

In the absence of statutory authority governing the administration of ECT to a minor, the trial court stated its intention to follow the procedures applicable to the authorization of involuntary treatment upon an adult (405 ILCS 5/2—107.1 (West 1996)).

Roberts testified at the first hearing that he had treated 40 to 50 patients with ECT. The youngest of these was 19 years old. He agreed with counsel for A.M.P. that considerable controversy exists within the psychiatric profession regarding ECT. Some consider it "barbaric." Roberts further testified that he had examined A.M.P. and reviewed her medical records. She was admitted to Carle Pavilion for an acute psychotic episode. A "thorough medical and neurological workup" did not reveal a cause, such as a brain tumor or metabolic imbalance, for this episode. Because he was unable to identify a cause, he diagnosed her condition as psychosis, not otherwise specified.

A.M.P.'s medical history revealed that she had been treated for an unexplained seizure approximately 18 months earlier. She was placed on anticonvulsive medication and returned to school. Several months later, she "became mute and catatonic, [she] would not move, would not talk." Treatment with antipsychotic medication helped for a time, but then her condition deteriorated. She became agitated and unable to care for herself. Her parents admitted her to Carle Pavilion out of fear that "if she escaped or got out on her own *** she would probably get into a dangerous situation." By the time of the hearing, however, A.M.P. had returned to her parents' home. Roberts suggested ECT because it "can be helpful for some patients when medication does not help" and because the risk, when compared to the potential benefit, is "minimal."

Counsel for the parents asked Roberts if A.M.P. is able "to make reasonable decisions about her treatment." Roberts stated that she is not. The trial court sustained the objection of the guardian *ad litem* (GAL) that this is not an issue when the respondent is a minor.

Roberts then explained, in detail, the ECT procedure and the anesthesia that is employed. He stated that side effects can include headache, dizziness, or confusion. A patient with a cardiac condition or a brain tumor faces greater risks. ECT causes a temporary increase in blood pressure that must be monitored by the anesthesiologist. With regard to A.M.P., he hoped that ECT would "snap[ ] [her] out of this psychotic state that she's been in." If she does not improve, she will eventually be institutionalized. In addition, side effects of continued treatment with antipsychotic medication include "drooling, muscular side effects, [and] tardive dyskinesia, *** a chronic involuntary muscle movement of the tongue and facial muscles." This condition can affect

respiration, leading to choking and pneumonia. Roberts concluded that the potential benefits of ECT outweigh the potential for harm to A.M.P.

Cross-examination of Roberts explored the potential risks of ECT and the dearth of literature on the use of ECT on younger patients. He stated he knows of no other untried appropriate treatment for A.M.P.'s condition.

During the hearing, A.M.P. talked to herself and moved from chair to chair. At one point, the trial court noted for the record that she was sitting on the floor, talking. Roberts was on the stand at the time and was asked if A.M.P. was currently on medication. He stated that she was taking the "newest antipsychotic medication available." Later, A.M.P. "simply got up and came up onto the bench."

Upon motion of counsel for A.M.P., the trial court appointed an expert, Dr. Robert Chapman, to assess her condition and make a recommendation. The hearing was continued to obtain the evaluation and to allow for a sufficient trial of A.M.P.'s newest medication.

When the hearing resumed, Chapman's written report was admitted into evidence. Chapman agreed substantially with Roberts, but recommended the possibility of increased intracranial pressure be investigated by spinal tap or ophthalmologic examination prior to the administration of ECT. He further recommended a trial of antimanic medication.

Roberts returned to the stand and responded to Chapman's recommendations. He stated that A.M.P. had already been evaluated for increased intracranial pressure by neurological and ophthalmological examinations and that further examination would be conducted prior to ECT. He also thought that antimanic medication had been tried before he began treating A.M.P. Her father confirmed this fact.

Both parents testified regarding A.M.P.'s condition and their understanding of the risks and benefits of ECT. Both parents expressed their consent for the treatment.

The trial court denied several motions made on A.M.P.'s behalf, including a motion for a directed verdict on the basis that section 2—107.1 of the Code, by its terms, does not apply to minors and a motion for summary judgment arguing that section 2—107.1 is unconstitutional. Counsel for the parents stated that even in the absence of a statute governing this situation, they had a common law right to consent to medical treatment for their daughter. Counsel for A.M.P. agreed that, absent a statute governing administration of ECT to minors, the parents' common law right to consent would govern.

The trial court's order states that A.M.P. is a minor and, by definition, is not competent to give informed consent for treatment. In any

event, the order notes, she has expressed no opinion on the subject of ECT. The parents have given their informed consent. However, the trial court continued, because of concerns for A.M.P.'s liberty interests, her parents' consent to ECT should be examined in light of the guidelines of section 2—107.1 of the Code. The trial court found clear and convincing evidence that the guidelines were met and made a specific factual finding with regard to each standard contained in section 2—107.1. The order authorizes up to 12 ECT treatments, within a period of 90 days, to be administered by Roberts.

The treatments have not been administered due to a stay pending this appeal.

## II. ANALYSIS

### A. Lack of Statutory Authority

■ Section 2—110 of the Code was previously titled "Electro-convulsion therapy—Psychosurgery—Consent." 405 ILCS 5/2—110 (West 1996). In *Branning*, this court held:

> "[T]the second paragraph of section 2—110, on its face, violates the due process clauses of the United States Constitution (U.S. Const., amend. XIV, § 2) and the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2) because it permits invasion of the liberty interests of wards in choosing whether to undergo the treatment provided without providing adequate safeguards." *Branning*, 285 Ill. App. 3d at 408, 674 N.E.2d at 466.

The statutory language to which we referred in this holding was:

> "If the recipient is a minor or is under guardianship, such recipient's parent or guardian is authorized, only with the approval of the court, to provide informed consent for participation of the ward in any such services which the guardian deems to be in the best interests of the ward." 405 ILCS 5/2—110 (West 1996).

The legislature subsequently amended section 2—110 of the Code by changing the title to "Unusual, hazardous or experimental services or psychosurgery" and deleting any reference to ECT in the first paragraph, but leaving the second paragraph unchanged. 405 ILCS 5/2—110 (West Supp. 1997).

Section 2—107.1 of the Code governs "Administration of authorized involuntary treatment upon application to a court" (405 ILCS 5/2—107.1 (West Supp. 1997)) but, by its terms, applies only to "adult recipient[s] of services" (405 ILCS 5/2—107.1(a) (West Supp. 1997)).

No other section of the Code deals with the question of authorization of or consent to ECT upon a minor. Thus, appellate counsel asserts, A.M.P. could argue on appeal that the order authorizing ECT upon her is null and void because it was issued pursuant to a statute

that does not apply in this situation. The gravamen of this argument is that the order and, therefore, this appeal are unnecessary.

In *In re E.G.*, 133 Ill. 2d 98, 549 N.E.2d 322 (1989), the supreme court considered whether a minor has the right to refuse medical treatment. *E.G.* involved a mature 17-year-old young woman who, for religious reasons, refused lifesaving treatment. Her mother supported her refusal. The court held that, in addition to constitutionally based rights to privacy and due process, "mature minors may possess and exercise rights regarding medical care that are rooted in this State's common law" (*E.G.*, 133 Ill. 2d at 109, 549 N.E.2d at 326), including the right to consent to or refuse care. Further, the "trial judge must determine whether a minor is mature enough to make health care choices on her own." *E.G.*, 133 Ill. 2d at 110, 549 N.E.2d at 327.

A.M.P.'s parents and her physician wisely sought guidance from the trial court before proceeding with ECT so that her rights, as discussed in *E.G.*, were not denied. A.M.P. was present in the courtroom during the proceedings and, except for becoming agitated when her name was mentioned, did not react to the discussion of the proposed therapy. She is clearly not a mature minor, capable of making her own decisions regarding treatment of her psychosis.

A.M.P.'s parents wished to exercise their common law right to consent to treatment for their daughter. No statute prevented such consent. The GAL and counsel for A.M.P. agreed that the parents had the authority to give consent. The trial court was asked to examine the parents' exercise of authority to ensure that A.M.P.'s liberty interests were protected. The trial court clearly understood that section 2—107.1 of the Code was not directly applicable. It merely adopted the framework of section 2—107.1 as a guide to its analysis. The trial court endeavored to provide the constitutional safeguards to which A.M.P. is entitled and to protect her rights under the common law, despite the lack of statutory guidance.

We conclude that the trial court's order was not null and void and certainly not unnecessary. Appellate counsel is correct that an appeal on this basis is without merit.

### B. Trial Court's Application of Statutory Factors

The real questions in this case, not addressed in the brief, are: (1) what is a trial court to do when faced with this situation and (2) did the trial court in this case act properly?

■ Our decision in *Branning* makes it clear that when ECT is proposed, a ward or a minor patient is entitled to greater protection than mere court approval of the parent's or guardian's informed consent. We held in *Branning* that, for the patient's liberty interests

to be served, the petitioner "must show the individual is unable to make a rational decision for himself regarding treatment." *Branning*, 285 Ill. App. 3d at 412, 674 N.E.2d at 469. The standard of proof is clear and convincing evidence. *Branning*, 285 Ill. App. 3d at 412, 674 N.E.2d at 469. "The court must also find that the treatment is in fact in the recipient's best interest." *Branning*, 285 Ill. App. 3d at 412, 674 N.E.2d at 469. Implicit in this requirement is that the treatment also be "the least intrusive method available." *Branning*, 285 Ill. App. 3d at 412, 674 N.E.2d at 469. In terms of procedural due process, we were concerned with the lack of requirements for input from a health care professional, a limit on the length of time the service could be forced upon the patient, and an opportunity for the patient to be heard. *Branning*, 285 Ill. App. 3d at 413, 674 N.E.2d at 469. We concluded:

> "At a minimum, however, the ward must receive a hearing at which he will be allowed to appear, present witnesses on his own behalf[,] and cross-examine witnesses against him. He must receive competent assistance at this hearing, although due process does not require that the assistant be a lawyer. [Citation.] The ward must be shown to be unable to make a reasoned decision for himself about the treatment and the treatment must be shown to be in his best interest, *** [citation] *** includ[ing] a requirement that the treatment be the least restrictive alternative. The proof must at least be by clear and convincing evidence. [Citation.]
>
> The ward is also entitled to an independent psychiatric examination ***. The value of an independent examination is clear—it provides a check on the judgment of the treating psychiatrist." *Branning*, 285 Ill. App. 3d at 417, 674 N.E.2d at 472.

In *Branning*, the respondent patient was a ward whose guardian sought to give informed consent to ECT. In the present case, the re-. spondent is a minor. In either situation, a hearing should be held to establish whether the patient is competent to exercise common law, statutory, or constitutional rights to refuse treatment. If not, the trial court must determine whether ECT is in the best interests of the patient, while ensuring that the due process concerns of *Branning* are met.

■ In this case, the trial court found by clear and convincing evidence that A.M.P. was not a mature minor, competent to make a reasoned decision on her own behalf. Her treating psychiatrist provided input, as did an independent medical expert appointed by the trial court. The order placed a limit on the number of ECT treatments and their duration. A.M.P. was given an opportunity to be heard and the assistance of counsel and the GAL. Although the trial court did

not use the terms "best interests" or "least restrictive alternative," the order states:

> "The benefits of treatment outweigh the harm; without effective intervention, [A.M.P.] will ultimately face long-term institutionalization ***.
>
> ***
>
> Less restrictive services, including psychotropic medications and hospitalizations, have not significantly controlled the psychosis; the latest trial of psychotropic medication partially alleviated [A.M.P.'s] symptoms but did not affect her long-term prognosis."

The trial court adopted the factors of section 2—107.1 of the Code to guide its best interests analysis. This is not an improper application of a statute. Rather, it is a distinctly common law approach. When faced with a question of first impression, the trial court looked to the case law (*Branning*, 285 Ill. App. 3d 405, 674 N.E.2d 463) for direction and then employed the statutory framework applicable to involuntary treatment of adults as a tool, reasoning:

> "[Section 2—107.1 of the Code] now includes ECT in the category of authorized involuntary treatment and specifies the procedures and factors the Court must consider before it authorizes such treatment for an adult recipient of services; conditions for considering such treatment for a minor are not spelled out elsewhere in the statutes, but neither is such treatment prohibited by statute; this vacuum as to statutory authority could deprive a minor of appropriate treatment; the better approach would be to apply the guidelines applicable to treatment of adults to [e]nsure a rigorous analysis of the appropriateness of ECT for a minor."

We, thus, agree with appellate counsel's argument that it would be unavailing to argue on appeal that the trial court's findings with regard to the statutory factors of section 2—107.1 of the Code were manifestly erroneous. Such an argument would not succeed because the factors are not controlling. It was not error, however, for the trial court to utilize these factors to guide its best interests analysis.

Finally, as we read the record, the procedure employed by the parents and the trial court resembled a declaratory judgment action. See, *e.g.*, *Curran v. Bosze*, 141 Ill. 2d 473, 489-90, 566 N.E.2d 1319, 1327-28 (1990) (discussing, with approval, *Hart v. Brown*, 29 Conn. Super. Ct. 368, 289 A.2d 386 (1972), in which parents of seven-year-old twins brought a declaratory judgment action, seeking a declaration that they had the right to consent to the transplant of a kidney from one twin to the other). This proceeding was valuable because it gave A.M.P. the opportunity to demonstrate whether she had the capacity to refuse ECT, provided her the safeguards of procedural due process, and ensured that her parents and treating physician were acting in her best interests.

A gap exists in the Code. We invite the legislature to address this problem. In the absence of statutory guidance, a trial court faced with a petition to approve a parent's exercise of informed consent to ECT upon a minor should take guidance from the approach of the trial court in this case.

## III. CONCLUSION

For the foregoing reasons, the order of the trial court is affirmed and the motion to withdraw is granted.

Affirmed.

KNECHT, P.J., and STEIGMANN, J., concur.